**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**ALBERT ZEH,**

       **Plaintiff,**

**v.**

       **Case No. 1:20-cv-00455-TSE-IDD**

**TRUIST BANK and**
**TRUIST FINANCIAL CORP.,**

       **Defendants.**

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Maureen R. Knight, VSB 47053
Andrew M. Witko, VSB 88114
**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
12500 Fair Lakes Circle, Suite 300
Fairfax, Virginia 22033
mknight@constangy.com
awitko@constangy.com
(571) 522-6100 Telephone
(571) 522-6101 Facsimile

*Counsel for Defendants*

7089275v.1

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY ........................................ 1

II.  MATERIAL FACTS NOT IN DISPUTE ................................. 3

III.  SUMMARY JUDGMENT STANDARD ................................. 13

IV.  ARGUMENT .................................................................. 14

    a.  *Mr. Zeh Cannot Establish a* Prima Facie *Case of Age Discrimination* ... 14

        i.  Mr. Zeh Did Not Suffer an Adverse Action ................... 15

        ii.  Mr. Zeh Concedes that, at the Time of His Retirement, He Was Not Meeting BB&T's Expectations ................... 20

    b.  *Even if Mr. Zeh could Establish that He Was Discharged and He Was Meeting BB&T's Expectations at that Time, His Claim Still Fails Because He Cannot Show that His Age Was the But-For Cause of His Separation* ................................. 21

V.  CONCLUSION .................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422 (4th Cir. 2015) ............... 15

*Am. Arms Int'l v. Herbert*, 563 F.3d 78 (4th Cir.2009) ............................. 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................. 13

*Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309 (S.D.N.Y. 2009) ............... 16

*Arthur v. Pet Dairy*, 593 F. App'x 211 (4th Cir. 2015) ............................. 22

*Asip v. Chesterfield Cty. Sch. Bd.*, No. 3:18-CV-261-JAG, 2019 WL 495584 (E.D. Va. Feb. 8, 2019) ............................. 21

*Bart-Williams v. Exxon Mobil Corp.*, No. 1:16-CV-1338-GBL-TCB, 2017 WL 4401463 (E.D. Va. Sept. 28, 2017) ............................. 21

i

*Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020) .................................................14

*Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514 (4th Cir. 2003) .............   14

*Bossalina v. Lever Bros.*, 849 F.2d 604 (4th Cir. 1988) ...............................................16

*Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269 (4th Cir. 1985) ...........................16

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985) ....................................16, 20

*Brown v. Dir. SCDC*, No. 8:08-cv-3761, 2010 WL 3167332 (D.S.C. May 28, 2010) .........19

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ........................................15

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) .................................15

*Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) .................................................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................13

*Granet v. Presidio, Inc.,* No. 3:19-cv-821,
       2020 WL 6147000 (E.D. Va. Oct. 20, 2020) ....................................................14

*Gross v. FBL Financial Servs.*, 557 U.S. 167 (2009) ...................................................22

*Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180 (4th Cir. 2004) .........................16

*Jolly v. Univ. of N. Carolina at Wilmington*, 831 F. Supp. 2d 916 (E.D.N.C. 2011) .........15

*Martin v. Scott & Stringfellow, Inc.*, 643 F. Supp. 2d 770 (E.D. Va.),
       aff'd, 352 F. App'x 778 (4th Cir. 2009) ..........................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................13

*Munday v. Waste Mgmt. of N.A., Inc.*, 126 F.3d 239 (4th Cir. 1997) .........................16

*Othentec Ltd. v. Phelan*, 526 F.3d 135 (4th Cir.2008) ...........................................13, 14

*Payne v. Fairfax Cty.*, No. 1:05CV1446 (JCC),
       2006 WL 3196545 (E.D. Va. Nov. 1, 2006) ...................................................15

*Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004) ........................................17

*Proud v. Stone*, 945 F.2d 796 (4th Cir.1991) .............................................................24

ii

*Sagar v. Oracle Corp.*, 914 F. Supp. 2d 688, 695 (D. Md. 2012),
    aff'd, 523 F. App'x 999 (4th Cir. 2013) .................................................................20

*Sancho v. Anderson Sch. Dist. Four*, No. CV 8:15-1353-HMH-KFM,
    2016 WL 4150476 (D.S.C. June 20, 2016),
    aff'd, 676 F. App'x 204 (4th Cir. 2017) .................................................................17

*Shetty v. Hampton University*, No. 4:12-cv-158,
    2014 WL 280448 (E.D. Va. Jan. 24, 2014) .............................................................17

*Stone v. University of Maryland Medical System. Corp.*,
    855 F.2d 167 (4th Cir. 1988) ..................................................................................18

*U.S. Equal Employment Opportunity Comm'n v. CTI Glob. Sols., Inc.*,
    815 F. Supp. 2d 897 (D. Md. 2011) .......................................................................16

*Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) ...............................19

*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006) ........................................14

*Webb v. Fischer Packing Co.*, 812 F.2d 1402 (4th Cir. 1987) ......................................23

*Westmoreland v. TWC Admin. LLC*, 924 F.3d 718 (4th Cir. 2019) ..............................22

*Williams v. Giant Food Inc.*, 370 F.3d 423 (4th Cir. 2004) .........................................17

*Zepp v. Rehrmann*, 79 F.3d 381 (4th Cir. 1996) .........................................................18

## **Statutes**

29 U.S.C. § 623 ...........................................................................................................2

## I.      INTRODUCTION AND SUMMARY

Albert Zeh was sixty-eight years old when, on December 7, 2015, he notified his employer, Branch Banking & Trust ("BB&T"), that he wished to retire in late March 2016.   Following his March 31, 2016, retirement from Branch Banking & Trust ("BB&T"),[1] Mr. Zeh did not apply for unemployment benefits because, according to him, he was "not involuntarily separated." Likewise, after his retirement, he did not post a resume online or apply to work at another bank or any kind of financial services provider.   Instead, Mr. Zeh, who had spent almost fifty years in banking, elected to work part-time as a driver for Reston Limousine Services.   Mr. Zeh enjoyed his retirement, ultimately moving to San Diego, relaxing on the beaches, reading, and spending time with his wife who also retired.

Mr. Zeh had worked for BB&T since 1991, but since receiving a promotion in 2007, he had struggled to meet the expectations of multiple supervisors.   Following three years of poor performance, Alice Williams, his supervisor at the time, placed Mr. Zeh on his first performance improvement plan ("PIP") in November 2011.   Mr. Zeh concedes that his negative evaluations from 2009 to 2011 were justified and that it was appropriate for Ms. Williams to place him on the PIP.   He does not believe that his age contributed to his negative performance evaluations or to the PIP issued by Ms. Williams.

While Mr. Zeh showed slight progress during his first PIP, he still did not meet the minimum requirements of his position and ultimately he was transferred to a different position with a reduction in pay.   This position did not require Mr. Zeh to generate new clients, an area with which Mr. Zeh had struggled for the prior four years.   However, in 2014, BB&T eliminated that position across the entire bank and Mr. Zeh was then transferred to the role of Small Business Specialist II working for Mark Menkis.

---

[1] As discussed below, Truist Bank is the successor-in-interest to BB&T.

While Mr. Zeh's performance under Mr. Menkis was originally satisfactory, it began to decline in 2015.  Mr. Menkis issued Mr. Zeh a 2015 mid-year review that outlined Mr. Zeh's performance deficiencies.   Mr. Zeh concedes that he was "not meeting [Mr. Menkis's] expectations," and, in response to his mid-year review, wrote, "I can do better and I will." Unfortunately, Mr. Zeh's performance continued to deteriorate and, in October 2015, Mr. Menkis placed Mr. Zeh on a second PIP.   Mr. Menkis met with Mr. Zeh throughout the first two months of the three-month PIP, providing help and guidance on how Mr. Zeh might improve various aspects of his performance.   But by the end of the second month of the PIP, Mr. Zeh's performance had actually *worsened*.   Then, with no prodding, prompting or even encouragement by Mr. Menkis, Mr. Zeh decided to retire effective roughly four months later.

In his complaint, Mr. Zeh asserts a single count of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623, *et seq.* ("ADEA").  His claim fails for several reasons.

***First***, Mr. Zeh cannot establish that he suffered an adverse action.   He acknowledges that he voluntarily retired from his position.

***Second***, Mr. Zeh cannot establish that that he was meeting his employer's expectations at the time of his separation.   He acknowledges that his performance was deficient and concedes that he was not meeting the goals and requirements of his position.

***Third***, even if he could establish he was subjected to an adverse employment action and was meeting his employer's expectations at that time, Mr. Zeh has no evidence to establish that his age was the but-for cause of any such action.   Indeed, when asked about proof of age discrimination, Mr. Zeh (correctly) concedes, "What I know and what I think are different."

For these reasons, Defendants ask the Court for entry of summary judgment in their favor.

2

## II.      MATERIAL FACTS NOT IN DISPUTE

### A.      *Background on the Parties.*

1.      Truist Financial Corporation ("TFC") is a bank-holding company formed on December 7, 2019, as a result of various mergers including SunTrust and BB&T Corporation. Ex. 1, Mark Menkis Dec. at ¶ 3.

2.      Truist Bank is a wholly-owned subsidiary of TFC, and the successor-in-interest to the entity that employed Mr. Zeh.   *Id.* at ¶ 4.

3.      At all times relevant to this litigation, Mr. Zeh was an employee of BB&T.   Ex. 2, Zeh Dep. at 31:1-15.

4.      After working in banking for nearly 33 years, Mr. Zeh became an employee of BB&T in or about January 2001, when his employer merged with BB&T.   *Id.* at 31:4-15.

5.      Mr. Zeh worked for BB&T from January 2001 until his retirement on March 31, 2016.   *Id.* at 19:2-16; 206:16-207:8.

### B.      *Mr. Zeh Fails to Meet Alice Williams' Expectations.*

6.      In 2004, Mr. Zeh began reporting to Alice Williams.   *Id.* at 76:2-15.

7.      According to Mr. Zeh, Mr. Zeh and Ms. Williams had a "good relationship" and he "appreciate[d] the respect that [Ms. Williams] had shown [him]."   *Id.* at 77:14-15; 79:4-17.

8.      Mr. Zeh does not think that Ms. Williams had any bias against him because of his age.   *Id.* at 79:18-21.

9.      On October 7, 2007, Ms. Williams promoted Mr. Zeh from a Business Services Officer III to a Business Services Officer IV.   *Id.* at 80:14-81:21; Ex. 3, 10/25/07 Letter from Williams to Strehle, Truist Doc. No. 2106.

7089275v.1

10.     Every year, supervisors issue their employees a personal development plan that functions as an annual review.   Ex. 2 at 82:21-83:14.

11.     Employees receive the following ratings across a number of different performance areas and objectives:   needs immediate improvement, growth opportunity, performer, very good performer, and exceptional performer.   Ex. 4, 2009 Annual Review, Truist Doc. No. 1616-29.

12.     Being rated as a "growth opportunity" means that the employee is not meeting his supervisor's expectations.   Ex. 2 at 86:3-6.

13.     A rating of "needs immediate improvement" indicates that the employee's "level of achievement is considered to be below the minimum requirements for the position."   Ex. 4 at 1616.

14.     In Mr. Zeh's annual review for 2009, Ms. Williams rated him as a "growth opportunity" in three core categories and in two of the five objectives.   Ex. 2 at 82:17-83:14; 93:1-4; Ex. 4.

15.     In the 2009 review, Ms. Williams wrote of Mr. Zeh, "Since [receiving a promotion in 2007], his performance has been below expectations for a BSO IV."   *Id.* at 1626.

16.     Mr. Zeh did not dispute his negative evaluation.   He wrote at the time, "I allowed myself to get behind and bogged down and have for the past two months worked to get out from under the backlog I myself created.   I'm not completely caught up but have made a lot of progress."   Ex. 5, 1/14/10 E-mail from Zeh to Williams, Truist Doc. No. 1615.

17.     In particular, generating or attracting new clients was a "difficult area" for Mr. Zeh in 2009 and continued to be over the next several years.   Ex. 2 at 126:9-13.

18.     In addition to annual reviews, supervisors conduct mid-year employee evaluations as part of the performance review process.   *Id.* at 103:14-21.   Supervisors do not provide a rating

for each specific objective or core competency.   Instead, the supervisor provides general comments describing the employee's year-to-date performance.   *Id.* at at 104:9-17; *see generally* Ex. 6, 2011 Mid-Year Review, Truist Doc. No. 2874-82.

19.     Ms. Williams conducted Mr. Zeh's 2010 mid-year review on or about July 29, 2010.  Ex. 7, 2010 Mid-Year Review, Truist Doc. at 3217-24.   Among other comments, Ms. Williams noted that Mr. Zeh was failing to meet his 80% balanced performance goals and stated that his "pipeline has been weak this year, indicating the need for additional prospecting to generate new business."  *Id.* at 3221.

20.     Ms. Williams conducted Mr. Zeh's 2011 mid-year review on or about August12, 2011.  Ex. 2 at 105:4-6; Ex. 6.   She concluded Mr. Zeh's mid-year assessment by writing, "[Year to date] Al continues to have a very challenging year in productivity and results.   His balanced performance [year to date] is 57% - well below requirements.   He is not meeting threshold in any production/matrix category other than loan pricing.   Al's results and need for improvement continues to be discussed in our regularly scheduled coaching sessions."  *Id.* at 2880.

21.     Mr. Zeh acknowledged Ms. Williams believed that Mr. Zeh needed to improve his performance, and Mr. Zeh had no reason to think that Ms. Williams held this belief because of his age.  Ex. 2 at 110:13-20.

22.     Ms. Williams issued Mr. Zeh his 2011 annual review on or about February 28, 2012.  Ex. 2 at 111:12-18; Ex. 8, 2011 Annual Review, Truist Doc. No. 2852-61.

23.     Ms. Williams rated Mr. Zeh's overall performance as "needs immediate improvement," the lowest rating that an employee can receive.  *Id.* at 2860; Ex. 2 at 116:1-10.

24.     Ms. Williams wrote in the review that she had "pretty significant concerns" about Mr. Zeh's performance.   Ex. 2 at 113:8-11.   Ms. Williams also noted, "This is Al's third year in a row of weak performance."   Ex. 8 at 2854.

25.     Mr. Zeh had no reason to believe that Ms. Williams was lying in her assessment of his performance or that his age played any role in her evaluation of him.   Ex. 2 at 117:2-9.

### C.     Mr. Zeh's First Performance Improvement Plan.

26.     On November 22, 2011, Ms. Williams placed Mr. Zeh on a performance improvement plan (PIP).   Ex. 9, 11/22/11 PIP, Truist Doc. No. 2216-21.   A PIP is a disciplinary tool that notifies employees of severe performance deficiencies and identifies specific areas where they are expected to improve.   Ex 1, ¶ 5.

27.     Mr. Zeh acknowledges that Ms. Williams was justified in putting him on the PIP and her decision had nothing to do with his age.   Ex. 2 at 129:2-9.

28.     In the PIP, Ms. Williams identified eight areas where Mr. Zeh was not meeting the threshold targets and stated the goals that Mr. Zeh was expected to meet.   *Id.* at 133:21-134:5; Ex. 9.

29.     On January 31, 2012, Ms. Williams issued Mr. Zeh a written warning, notifying him that he was not on track to meet the goals of his PIP and identifying specific areas in which he continued to underperform.   Ex. 10, 1/31/12 Warning, Truist Doc. No. 2180-3; Ex. 2 at 136:4-7

30.     Ms. Williams met with Mr. Zeh again on or about February 16, 2012.   She informed Mr. Zeh that he was not "on track to even closely meet the goals" and that she was "extremely disappointed."   Ex. 11, 2/16/12 Williams Memo, Truist Doc. No. 2179; Ex. 2, Zeh Dep. at 138:4-139:8.

31.     After the February 16, 2012 meeting, Ms. Williams saw improvement in Mr. Zeh's performance.   While he did not meet the thresholds outlined in the PIP, he "made some progress" and, on April 16, 2012, Ms. Williams agreed to extend his PIP period.   Ex. 12, 4/16/12 PIP Memo, Truist Doc. No. 2164.   Notwithstanding that he had again failed to meet the PIP's performance thresholds, Ms. Williams extended the PIP period a second time in August 2012 after Mr. Zeh "continue[d] to make progress."   Ex. 13, 8/8/12 PIP Memo, Truist Doc. No. 2148.

32.     Mr. Zeh worried that his employment was going to be terminated while he was on the PIP.   Ex. 2 at 147:13-16.   Although he did not believe that his age had anything to do with his placement on the PIP and that Ms. Williams was "justified" in her assessment of his performance, Mr. Zeh nonetheless retained an attorney to write a letter to the bank on his behalf.   *Id.* at 145:11-22; Ex. 14, 3/26/12 Letter from David to Strehle, Truist Doc. No. 2173-75.

33.     In the letter, Mr. Zeh's then-attorney wrote that Mr. Zeh "plans to likely cease full-time work as of the summer of 2014."   *Id* at 2175.

34.     Soon thereafter, Mr. Zeh transferred to the position of Servicing Business Services Officer II.   Ex. 2 at 149:4-150:17; Ex. 15, SBSO II Job Description, Truist Doc. No. 3063.

35.     In this new position, Mr. Zeh was not responsible for generating new business and was assigned to work on smaller relationships.   Ex. 2 at 151:13-152:4.   He also received a reduction in compensation.   *Id.* at 152:5-9.

36.     In or about late 2013, BB&T eliminated the Servicing Business Services officer role across the bank.   *Id*. at 153:1-6.   BB&T then transferred Mr. Zeh to work for Mark Menkis as a Small Business Specialist II.   Ex. 2 at 153:7-154:6, 155:7-9; Ex. 16, Truist Doc. No. 3065.

**D.      *Mr. Zeh's Initial Positive Relationship with Mr. Menkis.***

37.      The Small Business Specialist II role was functionally equivalent to the role of Business Services Officer that Mr. Zeh had held while working for Ms. Williams.   Ex. 2 at 154:7-20.

38.      At the outset, Mr. Zeh got along "just fine" with Mr. Menkis and Mr. Zeh believed Mr. Menkis was not a bad supervisor.   *Id.* at 158:4-10.   Mr. Zeh saw Mr. Menkis basically every day during 2014 and had no problems working with him.   *Id.* at 164:13-18.

39.      In or about March 2015, Mr. Menkis issued Mr. Zeh an annual review for calendar year 2014.   Ex. 17, 2015 Annual Review, Truist Doc No. 2085-2087; Ex. 2 at 160:21-161:10; 163:15-18.   Mr. Menkis rated Mr. Zeh as "meets expectations" and issued him a bonus and salary increase.   *Id.* at 161:16-162:2.   At that time, Mr. Zeh was 67 years old.   *Id.* at 10:20-21.

**E.      *Mr. Zeh's Declining Performance and Second Performance Improvement Plan.***

40.      In 2015, Mr. Zeh's performance declined.   Ex. 1, ¶ 7.      First, in February 2015, Mr. Zeh received a written warning from Mr. Menkis for a mistake that he had made involving a real estate valuation.   Ex. 2 at 178:1-12; Ex. 18, 2/13/15 Real Estate Valuation Warning, Truist Doc. No. 2071-72.   Mr. Zeh does not believe that his age was a factor in receiving the written warning.   Ex. 2 at 180:5-8.

41.      Further, Mr. Zeh's revenue production had declined from fifteenth in the company in 2014 to thirty-fifth by mid-2015. Ex. 17 at 2086; Ex. 19, 2015 Mid-Year Review, Truist Doc. No. 2610-13.

42.      Mr. Zeh alleges that, beginning sometime in May or June 2015, Mr. Menkis became publicly critical of his performance during weekly team meetings, which Mr. Zeh describes as a "tactical take-down line-by-line; what are you doing, why aren't you doing better,

8

what happened to this deal that you talked about last week, and it was –it built from a mild to a hurricane, if you will, over a period of time." Ex. 2 at 167:5-10.  Mr. Zeh describes this work-related criticism as bullying.  *Id.* at 165:21-167:18.  But he did not testify that any age-related comments were made by Mr. Menkis during these meetings or at any other time.  *Id.* at 169:6-8.

43.    Moreover, Mr. Zeh acknowledges that he was not performing satisfactorily during this time, that he was "having a hard time [in terms of loan production]" and "having a lot of deals turned down."  *Id.* at 168:6-10.   And Mr. Zeh acknowledges that Mr. Menkis was not to blame for these issues, nor was his age.  *Id.* at 175:1-8.

44.    Mr. Menkis issued Mr. Zeh his 2015 mid-year review on September 3, 2015.  Ex. 19.   In the evaluation, Mr. Menkis wrote, "During the first six months of this review period, your performance is not meeting expectations compared to the goals and objectives established for your position as a Small Business Specialist."  *Id.* at 2612.

45.    Mr. Zeh's "decathlon score," a composite of various metrics by which employees are evaluated, was 57.71%, which was well below the expectation of at least 70%.  *Id* at 2610.   Similarly, he achieved less than 65% of his monthly revenue goal, putting him near the bottom among employees in his position.  *Id.*

46.    Mr. Zeh does not dispute the accuracy of Mr. Menkis's assessment.  Ex. 2 at 181:2-10.   In fact, Mr. Zeh concedes that, as of September 2015 when his mid-year review was issued, he was "not meeting expectations compared to the goals and objectives for [his] position as a small business specialist."  *Id.* at 186:10-15.   On his mid-year review, Mr. Zeh commented, "I can do better and I will."  Ex. 19 at 2610.

47.     Because of his continued poor performance, Mr. Menkis placed Mr. Zeh on another PIP on October 1, 2015.   Ex. 20, 10/1/15 PIP, Truist Doc. No. 2061-63.   And again Mr. Zeh concedes that, at the time the PIP was issued, he was not meeting the minimum expectations of his position.   Ex. 2 at 193:2-4.

48.     Over the course of the PIP, Mr. Menkis met with Mr. Zeh more frequently than once per month and offered him guidance on how Mr. Zeh might improve various aspects of his performance.   Ex. 2 at 194:15-19; Ex. 1, ¶8.

49.     Concerned that Mr. Zeh was not improving on the PIP, on November 4, 2015, Mr. Menkis issued Mr. Zeh a written warning that outlined Mr. Zeh's performance deficiencies.   Ex. 21, 11/4/15 Warning, Truist Doc. No. 2067-68; Ex. 1, ¶ 8-10.   In some areas, Mr. Zeh's performance had declined even further than his sub-standard performance earlier in the year.   For instance, Mr. Zeh's year-to-date "decathlon score" was 54.8% (again, well below the minimum expectation of 70%) and was only 47% for the month of September 2015.   Ex. 1; Ex. 21.

50.     Despite this warning, Mr. Zeh's performance did not improve and in fact declined further in critical areas.   For instance, Mr. Zeh was required to generate $16,000 in monthly revenue.   He had produced only **$1,565** for November as of November 27, 2015.   Ex. 22, 12/3/15 Warning, Truist Doc. 2069-70; Ex. 1, ¶ 9-10.   How much revenue an employee brings in is an "important factor" and "how [employees are] measured." Ex. 2 at 130:18-131:4.

51.     Mr. Zeh's already poor "decathlon score" also worsened after the November 4, 2015 warning.   For November 2015, he achieved only **16.20%**, even though again the expectation was at least 70%.   Ex. 1, ¶ 9-10; Ex. 22.   Likewise, Mr. Zeh was required to make two to three "planned purposeful calls" per day.   In November 2015, he averaged less than one call per day.   Ex. 1, ¶ 9-10; Ex. 22.

10

52.     As a result of this worsening performance in so many areas, Mr. Menkis met with Mr. Zeh on December 3, 2015 to discuss his declining performance.   Ex. 22.   Mr. Zeh acknowledged that he was not meeting BB&T's expectations at that time.   Ex. 2 at 198:1-7.

53.     Mr. Menkis cautioned Mr. Zeh during this meeting that a failure to improve his performance might lead to termination.   Ex. 1, ¶ 12.   Mr. Menkis never told Mr. Zeh to retire, never encouraged him to retire, and never said that he would be terminated if he did not retire – and neither did any other manager in Mr. Zeh's chain of command.   Ex. 1, ¶ 12; Ex. 2 at 190:5-14; 201:17-202:4.

### F.     *Mr. Zeh Retires.*

54.     On December 7, 2015, Mr. Zeh e-mailed Terrence Bayly, Human Resources Representative, the following message: "Good day to you Terrence! I would like to officially notify the bank of my intention to retire as of March 31, 2016.   Besides providing the notice in writing, to whom should I send notice of my intentions?"   Ex. 23, 12/7/15 E-mail from Zeh to Bayly, Truist Doc. No. 2059-60.   Later that day, Mr. Zeh followed up with an e-mail to Mr. Bayly and Mr. Menkis, writing: "This will confirm that I have spoken to the benefits department today establishing that I wish to retire effective 3 31 2016."   *Id.*

55.     Mr. Zeh never changed his mind about submitting his retirement application nor did he ever e-mail Mr. Bailey (or anyone else) to state that he wanted to continue working.   Ex. 2 at 206:6-15.

56.     Mr. Zeh was aware that BB&T's handbook included a procedure through which employees could raise concerns about discrimination.   *Id.* at 210:4-12.   Yet, Mr. Zeh never filed a complaint of age discrimination with BB&T nor did he make any informal complaints to anyone about alleged age discrimination.   *Id.* at 199:8-12.

57.     And Mr. Zeh never asked Mr. Menkis or anyone else if his PIP could be extended to allow him more time to improve his performance, despite the fact that BB&T had done so with regard to his first PIP.   *Id.* at 141:8-143:7; 200:4-7.

58.     After he announced his retirement, he prepared for it – such as taking steps to leave his files in good working order, meeting with friends, and cleaning out his office.   *Id.* at 205:10-206:8.

59.     After his department threw him a retirement party, he retired from BB&T on March 31, 2016.   *Id.* at 67:17-20; 206:16-207:8.

60.     Mr. Zeh immediately began receiving monthly pension payments from BB&T and began drawing social security later in 2016.   Ex. 24, Plaintiff's Interrogatory Responses at p. 5.

**G.     *Mr. Zeh's Post-Retirement Actions and Inactions.***

61.     Mr. Zeh did not apply for unemployment benefits after leaving BB&T, because – in his own words -- he **"*retired as opposed to being involuntarily separated*."**   Ex. 2 at 65:19-66:12. He concluded that he "did not qualify for [unemployment benefits]" and "didn't even think of [applying]."   *Id.*

62.     After leaving BB&T, Mr. Zeh did not apply to work at any other banks or financial institutions.   *Id.* at 41:19-42:2.   Mr. Zeh never spoke to a recruiter or headhunter, and he never posted his resume online.   *Id.* at 65:10-18.

63.     Indeed, the only position Zeh ever applied for in the almost three years after leaving BB&T was as a part-time driver for Reston Limousine Service.   *Id.* at 42:15-43:20.   Mr. Zeh worked as a part-time driver for them from April 2016 to June 2017.   *Id.* at 56:17-57:11.   Mr. Zeh loved driving and met people he found very interesting, including the reigning Miss America, Garth Brooks, and an owner of one of the National Football League teams.   *Id.* at 57:12-20.

12

64.     Mr. Zeh ended his employment relationship with Reston Limousine Services after deciding to permanently relocate to San Diego, California.   *Id.* at 58:9-59:4.   Mr. Zeh's wife did not work and was retired at the time.   *Id.* at 62:9-13.

65.     Mr. Zeh described a typical day living in San Diego to include having breakfast, going to the beach, having a cup of coffee, watching people surf, perhaps spending a few hours at the YMCA, reading, and spending time with his wife.   *Id.* at 62:14-21.   Mr. Zeh lived in California for two years, and he did not work, nor did he attempt to work, during that period.   *Id.* at 11:19-20; 62:7-8.

## III.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 33 (1986).   Once the moving party has demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present facts showing that a genuine issue remains for trial.   *Id.* at 323-324.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotations omitted).   "The nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."   *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir.2008) (citation and internal quotations omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   And he cannot defeat summary judgment with merely a scintilla of evidence. *Am. Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir.2009).   Rather, he "must produce some evidence (more than a scintilla) upon which a jury could properly proceed to find a verdict for the

13

party producing it, upon whom the onus of proof is imposed." *Othentec Ltd.*, 526 F.3d at 140 (citations and internal quotations omitted).

Trial judges have an "affirmative obligation" to ensure factually unsupported claims and defenses do not proceed to trial. *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 526 (4th Cir. 2003).

## IV.   ARGUMENT

### A.   *Mr. Zeh Cannot Establish a* **Prima Facie** *Case of Age Discrimination*

To avoid summary judgment on a claim of discrimination, a plaintiff has two potential avenues:   direct evidence of discrimination or indirect evidence, using the familiar burden-shifting framework of *McDonnell Douglas*.   *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (in Title VII context); *Granet v. Presidio, Inc.,* No. 3:19-cv-821, 2020 WL 6147000, at *3 (E.D. Va. Oct. 20, 2020) (in ADEA context).   Mr. Zeh has no direct evidence of discrimination and, as such, must rely on the *McDonnell Douglas* burden-shifting analysis in order to show circumstantial evidence of age discrimination.

To establish a *prima facie* case of unlawful age discrimination, an employee must show that "(1) he is a member of the protected class; (2) he was qualified for the job and met [his employer's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006).   Mr. Zeh cannot establish a *prima facie* case of age discrimination because (i) he was not meeting BB&T's expectations at the time of his separation and (ii) *he was not even discharged*.

14

### 1.      Mr. Zeh Did Not Suffer an Adverse Action.

#### a.      Mr. Zeh Voluntarily Retired.

It is self-evident that a cornerstone of any discrimination claim is that the allegedly aggrieved employee or former employee was actually subjected to some form of adverse action. *See Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006)).   Because Mr. Zeh was not, his claim must fail.

Adverse employment actions include those that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits*." Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).   "[An employee's] voluntary retirement does not constitute an adverse employment action for purposes of Title VII or the ADEA." *Jolly v. Univ. of N. Carolina at Wilmington*, 831 F. Supp. 2d 916, 921 (E.D.N.C. 2011); *Payne v. Fairfax Cty.*, No. 1:05CV1446 (JCC), 2006 WL 3196545, at *4 (E.D. Va. Nov. 1, 2006) ("[W]ithout a discharge by the employer (and thus no adverse action), summary judgment is appropriate as to whether any discharge of Plaintiff constituted retaliation").

Here, Mr. Zeh concedes that he "retired as opposed to being involuntarily separated."   *See* Statement of Material Facts ("SOMF") at ¶ 61.   If Mr. Zeh's own concession was not enough, his conduct following his separation from BB&T further establishes that his leaving BB&T was, indeed, a retirement.   He did not apply for unemployment benefits, and he did not apply to a single job in his field or any full-time employment at all.[2]   *Id.* at ¶ 61-3.   He drew a pension and

---

[2]   Indeed, Mr. Zeh's actions were so consistent with his retired state that he failed to satisfy his statutory duty to mitigate damages even if he had been discriminated against.   Employees asserting claims involving an unlawful discharge "have a statutory duty to mitigate damages resulting from their employers' discriminatory adverse employment actions."   *U.S. Equal*

collected social security.   *Id.* at ¶ 60.   Mr. Zeh *told* BB&T he was retiring when he resigned from his job and he went on to *be* retired.

### b.   Mr. Zeh Cannot Establish that He Was Constructively Discharged.

In his Complaint, Mr. Zeh takes the position that he "was forced to retire under threat of termination."   Dkt. No. 1, Compl., ¶ 21.   But that argument is not remotely supported by either the facts or the case law.

Absent a "formal discharge," an employee is only entitled to relief if he can establish that he was forced to retire via a constructive discharge.   *Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004).   In order to establish a claim of constructive discharge, an employee must show that his employer deliberately made his working conditions so objectively intolerable as to force him to quit.   *See Munday v. Waste Mgmt. of N.A., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997).   "A plaintiff alleging constructive discharge must therefore prove two elements: (i) deliberateness of the employer's action, and (ii) intolerability of the working conditions."   *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).   Mr. Zeh can meet neither prong of the constructive discharge test.

Dealing first with intolerability, the only conduct about which Mr. Zeh complains was the weekly meetings where Mr. Menkis allegedly subjected him to ridicule and bullying.   SOMF, ¶

---

*Employment Opportunity Comm'n v. CTI Glob. Sols., Inc.,* 815 F. Supp. 2d 897, 911 (D. Md. 2011).   This duty requires the employee "to act in a reasonably diligent manner when seeking and accepting new employment *substantially equivalent to that from which [the employee] was discharged*."   *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir. 1985) (emphasis added).   Mr. Zeh unquestionably failed to engage in a good faith job search. Following his retirement from BB&T, Mr. Zeh failed to apply for a single job at a bank or financial institution, failed to post a resume online, and failed to contact a recruiter or headhunter.   SOMF, ¶ 62-4.   The Fourth Circuit has held that a failure to mitigate barred any recovery for the alleged age discrimination.   *See Bossalina v. Lever Bros.*, 849 F.2d 604 (4th Cir. 1988).   *See, also, Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 314 (S.D.N.Y. 2009) (granting employer's motion for summary judgment on issue of mitigation where former technology sales manager accepted waitressing position following separation).

42.   Mr. Menkis questioning Mr. Zeh (in front of his coworkers or otherwise) about deals that failed to close or inquiring as to why he was not performing better does not rise to the level of intolerability required in this Circuit.   *See, e.g., Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004) (no constructive discharge where employee's "supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, [and] chastised her in front of customers"); *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir. 1994) (no constructive discharge due to "a feeling of being unfairly criticized or difficult or unpleasant working conditions").

Likewise, naked reliance on the imposition of a PIP does "not constitute constructive discharge as a matter of law." *Sancho v. Anderson Sch. Dist. Four*, No. CV 8:15-1353-HMH-KFM, 2016 WL 4150476, at *9 (D.S.C. June 20, 2016), aff'd, 676 F. App'x 204 (4th Cir. 2017).   This Court dealt with a similar argument in *Shetty v. Hampton University*, No. 4:12-cv-158, 2014 WL 280448 (E.D. Va. Jan. 24, 2014).   There, the employee argued that he was "forced to quit" after being subjected to "unfair criticism" and placed on a PIP.   *Id.* at 17.   The Court rejected the employee's constructive discharge claim, noting that the employee "failed to set forth evidence that shows completion of the PIP would have been so intolerable as to compel a reasonable person to resign."   *Id.* (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004)).   The Court found the "[employee's] own perception and characterization of the [PIP] process as a 'sham'" insufficient to establish a constructive discharge and did not credit "[the employee's] belief that he must resign."   *Id.*

Moreover, the fact that BB&T permitted Mr. Zeh to continue working for four months after receiving his notice undercuts Mr. Zeh's claim that he was somehow "forced" to retire.   SOMF, ¶ 54-60.   The Fourth Circuit affirmed a lower court's summary judgment ruling in an employer's favor on the issue of constructive discharge, in part because "the effective date of his resignation

17

would be delayed, and that he would continue to receive his salary until his resignation became effective."  *See Zepp v. Rehrmann,* 79 F.3d 381, 386 (4th Cir. 1996) (citing *Stone v. University of Maryland Medical System. Corp.,* 855 F.2d 167 (4th Cir. 1988)).

Further undercutting Mr. Zeh's claim of constructive discharge are his *own actions* during the nearly four months between giving notice and his actual retirement date.   For instance, Mr. Zeh never complained to anyone that he was being forced into retirement, nor did he ask that his PIP be extended.   SOMF, ¶ 54-60.   Likewise, he never communicated to his supervisor or human resources that he had changed his mind about retirement, even though he had nearly four months to do so and he described a pleasant working environment during this time.   *Id*.   Instead, Mr. Zeh spent the last several months of his employment meeting with friends throughout the bank, cleaning out his office, and preparing files to transition his accounts.   *Id*.   His department even threw him a retirement party.   *Id*.   The Fourth Circuit found similar facts compelling when it affirmed a lower court's summary judgment ruling in an employer's favor on the issue of constructive discharge, noting that the employee "dictat[ed] the terms of his resignation and did not make any effort to rescind his resignation."   *See Zepp*, 79 F.3d at 386.

Mr. Zeh cannot establish that his working conditions were intolerable.   He therefore cannot establish he was subject to a constructive discharge and his claim fails.   But even if Mr. Zeh could establish that his working conditions were intolerable, his constructive discharge claim *still* fails because he cannot establish that Mr. Menkis engaged in conduct intended to make him resign because of his age.   "[T]his requirement means that the plaintiff must prove that the employer's actions were deliberate *and motivated by age bias*."   *Martin v. Scott & Stringfellow, Inc.*, 643 F. Supp. 2d 770, 782 (E.D. Va.) (emphasis added), aff'd, 352 F. App'x 778 (4th Cir. 2009).   In other words, the employee must offer "evidence that age-based animus was the cause of

18

any putatively intolerable employment conditions." *Id.* Mr. Zeh has not done so because he cannot do so.

Mr. Zeh presents literally no evidence that his age was a factor in any allegedly negative treatment he suffered. He received a written warning from Mr. Menkis for making a mistake regarding a real estate valuation, but does not believe his age was a factor. SOMF, ¶ 40. He received a negative evaluation from Mr. Menkis, but acknowledged it was an accurate assessment. *Id.* at ¶¶43-6. Even with regard to what he believed was harsh public criticism of his performance in or around May or June 2015 by Mr. Menkis, he conceded he was indeed not meeting BB&T's expectations regarding his performance. *Id.* And Mr. Zeh has no recollection of Mr. Menkis (or anyone else) making any age-related comments to him at any time, let alone during the weekly meetings during which Mr. Zeh believed Mr. Menkis was overly critical. *Id.* at ¶ 42.

At the end of the day, Mr. Zeh's claim is that he was sixty-eight years old and, although he concedes he was not meeting the expectations of his position, he was placed on a PIP with which he did not agree[3] and resigned before the PIP was concluded. These facts are insufficient to state a claim of constructive discharge. As the Fourth Circuit has stated: "[The employment

---

[3] Mr. Zeh asserts that he was held to a higher standard than younger employees of BB&T. But neither of the individuals he identifies are similarly-situated to him. He first points to Mr. Menkis as having numbers comparable to his own. But Mr. Menkis is a supervisor with supervisory responsibilities. "Supervisors and non-supervisors are not similarly situated." *Brown v. Dir. SCDC*, No. 8:08-cv-3761, 2010 WL 3167332, at *5 (D.S.C. May 28, 2010) (citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Second, Mr. Zeh points to the numbers of a new co-worker, Mythri Hanumanthaiah. Prior to becoming a Small Business Specialist in November 2014, Ms. Hanumanthaiah had no experience performing any of the functions of the role and she did not have a book of business upon which she could rely. The same is not true of Mr. Zeh, who had both the experience and existing customers to be successful if he were to put in the necessary effort. Indeed, Ms. Hanumanthaiah was in training for the two months she worked in 2014 and much of 2015, and the fact that her numbers were comparable to Mr. Zeh's (and surpassed his own when properly prorated) is further indication of Mr. Zeh's underperformance. Finally, Ms. Hanumanthaiah, who had never worked in this role before, ended 2015 with numbers better than Mr. Zeh and she went on to become a top 10% performer for the bank in 2016. Ex. 1 at ¶ 11.

19

discrimination laws] cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting."  *Bristow,* 770 F.2d at 1255.  That is precisely what Mr. Zeh seeks to do here.

Because Mr. Zeh was not constructively discharged, but voluntarily retired, he was not subjected to any adverse employment action and summary judgment should be granted.

### 2.    Mr. Zeh Concedes that, at the Time of His Retirement, He Was Not Meeting BB&T's Expectations.

Even assuming that Mr. Zeh's decision to retire on December 7, 2015, was an adverse action (it was not), he cannot establish that he was performing up to BB&T's expectations.   He is required to do so in order to establish even a *prima facie* case of age discrimination.  *Sagar v. Oracle Corp.*, 914 F. Supp. 2d 688, 695 (D. Md. 2012), aff'd, 523 F. App'x 999 (4th Cir. 2013). The record is replete with admissions from Mr. Zeh that he was not meeting BB&T's expectations at the time of his separation.

Mr. Zeh's performance deficiencies began long before he started working with Mr. Menkis.   Indeed, his prior supervisor, Ms. Williams, placed him on a PIP in 2012 that Mr. Zeh concedes was justified and had nothing to do with his age.   SOMF, ¶ 26.   And Mr. Zeh did not take issue with his transfer at the conclusion of the PIP to a lower-paying position with lesser responsibilities.  *Id.* at ¶ 34-5.

In 2015, Mr. Menkis placed Mr. Zeh on a second PIP, the very definition of confirming that Mr. Zeh was not meeting BB&T's expectations.  *Id.* at ¶ 47.   Mr. Zeh was, by his own admission, "having a hard time [in terms of loan production]" and "having a lot of deals turned down."  *Id.* at ¶ 43.   In his deposition, Mr. Zeh conceded that when he was placed on the second PIP, he was "not meeting expectations compared to the goals and objectives for [his] position as a small

20

business specialist." *Id.* at ¶ 46.   He made a similar concession in his 2015 mid-year evaluation issued in September 2015, "I can do better and I will." *Id.*

But Mr. Zeh did not do better.   Therefore, on December 3, 2015, Mr. Menkis met with Mr. Zeh to discuss his performance.   *Id.* at ¶ 52.   By then, Mr. Zeh's performance had *worsened*.   *Id.* at ¶ 49-51.   And in what is absolutely dispositive of this factor of his *prima facie* case, Mr. Zeh *admitted* that Mr. Menkis's assessment of his performance at that time was accurate and that he was not meeting BB&T's expectations as of four days later, when he decided to retire.   *Id.* at ¶ 47. The Court has concluded that employers are entitled to summary judgment based on these and similar facts.   *See, e.g.*, *Asip v. Chesterfield Cty. Sch. Bd.*, No. 3:18-CV-261-JAG, 2019 WL 495584, at *4 (E.D. Va. Feb. 8, 2019) (granting summary judgment where "[employee] may have previously performed well, but…did not meet expectations at 'a time reasonably close' to his termination"); *Bart-Williams v. Exxon Mobil Corp.*, No. 1:16-CV-1338-GBL-TCB, 2017 WL 4401463, at *11 (E.D. Va. Sept. 28, 2017) (granting summary judgment where "Plaintiff has not demonstrated a genuine dispute of material of fact as to whether she was performing up to ExxonMobil's legitimate expectations").

Mr. Zeh, on multiple occasions throughout his employment and during this litigation, *conceded* that he was not meeting his employer's expectations at the time of his separation.   This is fatal to his claim, and Defendants should be awarded summary judgment as a result.

### B.   Even if Mr. Zeh Could Establish that He Was Discharged and He Was Meeting BB&T's Expectations at that Time, His Claim Still Fails Because He Cannot Show that His Age Was the But-For Cause of His Separation.

Even if Mr. Zeh could establish a *prima facie* case of age discrimination, he cannot meet his ultimate burden of establishing that age was the "but-for" cause of his alleged forced retirement related to his PIP.   "When an employee has established a prima facie case, the burden shifts to the

21

employer to rebut this presumption of discrimination.  To do so, the employer must produce evidence that it acted for a legitimate, nondiscriminatory reason."  *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (internal citations omitted).  Clearly Defendants have done so by establishing the legitimacy of the issuance of the PIP.

Once the employer makes a showing that it acted in a legitimate, nondiscriminatory manner, the employee must establish by a preponderance of the evidence that age [and not the employer's stated reason(s)] was the 'but-for' cause of the challenged employer decision.  *Gross v. FBL Financial Servs*., 557 U.S. 167, 178 (2009).   "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Id*. at 180.   To this end, "if there existed other legitimate motivations for the [employment] decision, the employee must offer sufficient evidence to show these factors were not 'the reason' for the employer's decision."  *Arthur v. Pet Dairy*, 593 F. App'x 211, 220 (4th Cir. 2015) (citing *Gross,* 557 U.S. 176).   The Fourth Circuit "agree[s] with the majority of circuits that have considered the issue and concluded that *Gross* elevated the burden of proof many courts applied to ADEA claims."  *Arthur*, 593 F. App'x at 219.

Defendants' position, of course, is that there is no adverse employment decision here to defend.  Mr. Zeh clearly and unequivocally retired from his job.  SOMF*, ¶ 54. However, to the extent Mr. Zeh is arguing that he retired only because he was going to be fired at the conclusion of his PIP because he was not going to meet the objectives of it, clearly and self-evidently the but-for cause of such a hypothetical decision would be his failure to meet, or even make progress towards, the objectives of the PIP.  Mr. Zeh has proffered no evidence that such failure to meet, or make

22

progress towards meeting, the objectives of the PIP would <u>not</u> have been the real reason triggering such a hypothetical termination – but rather his age.

As discussed throughout, Mr. Zeh's performance in 2015 was poor.   It is beyond dispute that he was failing to meet the requirements of his position, a point which he readily concedes. SOMF, ¶ 43, 46-7, 52.   For instance, in November 2015, the last month of employment before Mr. Zeh provided notice of his retirement, Mr. Zeh's decathlon score was 16.2% as compared to a required 70%.   *Id.* at ¶ 51.   Further, as of November 27, 2015, he had generated only $1,565 in revenue for the month.   His monthly target was $16,000.   *Id.* at ¶ 50.   Mr. Zeh must proffer evidence to establish that Mr. Menkis's concerns about Mr. Zeh *achieving less than ten percent of his revenue generation goal* were anything but legitimate.   He, of course, cannot do so.   Indeed, the opposite is true insofar as Mr. Zeh concedes that "how much [revenue] you are bringing in" is an important factor and is "how you're measured."   *Id.*   Mr. Zeh testified to this point, "No matter how well you get along with your clients, no matter how much of a team player you are, no matter how well you mentor the younger people in the basics of the job, *the only thing that matters is what have you done for me lately*."   Ex. 1 at 131:1-10 (emphasis added).

At bottom, the evidence upon which Mr. Zeh bases his claim of discrimination is nothing more than the fact that he was the oldest employee reporting to Mr. Menkis in the Greater Washington Region.   This is plainly insufficient to state a claim for discrimination.   *See Webb v. Fischer Packing Co.,* 812 F.2d 1402 (4th Cir. 1987).   Mr. Zeh concedes that Mr. Menkis did not make any comments about his age or even a direct or indirect comment about the possibility of Mr. Zeh's retirement.   SOMF, ¶ 42; 53.   He concedes that his age played no role in any of his deals that did not close, which in turn led to his admittedly unsatisfactory numbers.   *Id.* at ¶ 43.   He concedes that the written warning Mr. Menkis issued him in February 2015 was not due to age

discrimination. *Id.* at ¶ 42.   And he acknowledges that his numerous sub-par performance evaluations – including the one Mr. Menkis issued him in September 2015 – were accurate assessments of his performance. *Id.* at ¶ 25, 27, 46.   On the flip side, Mr. Zeh fails to explain his theory that Mr. Menkis, in June of 2015, suddenly began discriminating against him on the basis of his age after having only just issued him a positive performance appraisal, salary increase, and bonus two months prior – all at a time when Mr. Zeh was 67 years old.[4]  *Id.* at ¶ 39.   And he fails to point to any similarly-situated employee whose performance was as poor as his who was not put on a PIP.[5]

To the extent Mr. Zeh argues that the adverse employment action to which he was subjected was the speculative termination that he says was promised if he did not meet the objectives of his PIP, no reasonable jury could find that the but-for reason for such hypothetical termination was Mr. Zeh's age and not his own poor performance.   And there is certainly no evidence to suggest that BB&T's concerns about his performance—which rated dead last in the Greater Washington Region by the end of 2015— were anything but legitimate.

## V.   CONCLUSION

Mr. Zeh retired.   No one told him that he had to retire in lieu of termination or that he would be terminated at the conclusion of his PIP.   He, of his own volition and after a fifty-year career in banking, elected to retire from BB&T, to fully exit the financial services industry, to

---

[4]   Courts in this Circuit routinely find that "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991).   The same rationale applies here. That Mr. Menkis would issue Mr. Zeh, at 67 years old, a positive performance appraisal, bonus, and salary increase, only to discriminate against him a few months later when Mr. Zeh is 68 years old, is wholly illogical.

[5]  *See* n. 3, *supra.*

obtain only a part-time job, to move to San Diego, and to enjoy time on the beach with his (also retired) wife.

Before his retirement, Mr. Zeh had periods where he admits did not meet BB&T's expectations, including the year leading to his retirement decision.  His job deficiencies were noted by more than one supervisor, including one with whom he had no issues.  And as to the supervisor with whom he does take issue, he has no explanation for why such supervisor would issue him a positive review and award him a salary increase and bonus at the age of 67, only to accurately point out his decreased *objective* performance and hold him accountable for the same at the age of 68.   That explanation, of course, is simple and self-evident:   his performance declined.  Mr. Zeh has offered no evidence that it was in fact his age and not his own poor performance that led his supervisor to place him on his second PIP.   To the contrary, he concedes that, at the time of his PIP and his resignation, he was not meeting the requirements of his position.  This is not a close case.

For the foregoing reasons, Defendants respectfully request that this Court grant its Motion for Summary Judgment and dismiss Mr. Zeh's Complaint with prejudice.

November 20, 2020                                    Respectfully submitted,

                                                     /s/ Andrew M. Witko
                                                     Maureen R. Knight, VSB 47053
                                                     Andrew M. Witko, VSB 88114
                                                     Constangy, Brooks, Smith & Prophete, LLP
                                                     12500 Fair Lakes Circle, Suite 300
                                                     Fairfax, VA   22033
                                                     mknight@constangy.com
                                                     awitko@constangy.com
                                                     (571) 522-6100 Telephone
                                                     (571) 522-6101 Facsimile

                                                     *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Marni E. Byrum, VSB #19190
McQuade Byrum PLLC
602 N. Columbus Street
Alexandria, Virginia 22314
Phone: (703) 548-4200
Fax:     (703) 548-4647
mebyrum@mcquadebyrum.com
*Counsel for Plaintiff*

/s/ Andrew M. Witko
Andrew M. Witko, VSB 88114
Constangy, Brooks, Smith & Prophete, LLP
12500 Fair Lakes Circle, Suite 300
Fairfax, VA   22033
awitko@constangy.com
(571) 522-6107 Telephone
(571) 522-6101 Facsimile

*Counsel for Defendants*

26

7089275v.1