**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ALBERT ZEH, ) | |
|     Plaintiff ) | |
|         v. ) | Civil Action No. 1:20-cv-455 |
| ) | |
| TRUIST BANK and TRUIST ) | |
| FINANCIAL CORP., ) | |
|     Defendants. ) | |

## MEMORANDUM OPINION

At issue in this Age Discrimination in Employment Act of 1967 ("ADEA") case is whether Defendants Truist Bank and Truist Financial Corporation, as successors-in-interest to BB&T Corporation ("BB&T"), are entitled to summary judgment on plaintiff's claim that defendants discriminated against Plaintiff Albert Zeh on the basis of age. Because this matter has been fully briefed and argued, it is now ready for disposition. For the reasons stated below, defendants' motion for summary judgment must be granted, as the undisputed factual record discloses that plaintiff has failed to establish a prima facie case for age discrimination.

**I.**

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Rule 56, Fed. R. Civ. P. Thus, it is important to identify the record facts as to which no genuine dispute exists. In this regard, Local Rule 56(B) directs a movant for summary judgment to include in its submission a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists; the nonmovant must then respond to each paragraph citing admissible record evidence to establish a genuine dispute of material fact. In this case, although both parties included some immaterial facts and plaintiff objected to facts with which plaintiff had no substantive record dispute, both parties have

1

substantially complied with the Local Rule. Accordingly, the following statement of facts is derived from a careful review of defendants' statement of undisputed facts, the nonmovant's response, and the record.

- Defendant Truist Financial Corporation is a bank-holding company formed on December 7, 2019, as a result of the merger of various companies including SunTrust and BB&T.[1]

- Defendant Truist Bank is a wholly-owned subsidiary of Truist Financial Corporation, and the successor-in-interest to the entity that employed plaintiff.[2]

- Plaintiff Albert Zeh was an employee of BB&T at all times relevant to this litigation.

- After working in banking for nearly 33 years, plaintiff became an employee of BB&T in or about January 2001, when his employer merged with BB&T.

- Plaintiff worked for BB&T from January 2001 until his retirement on March 31, 2016.

- Around 2004, plaintiff began reporting to Alice Williams.

- According to plaintiff, plaintiff and Williams had a "good relationship" and plaintiff "appreciate[d] the respect that [Williams] had shown [him]." Zeh Dep. at 77:14-15; 79:4-17. Plaintiff does not contend that Williams had any bias against plaintiff because of plaintiff's age.

- In October 2007, Williams recommended plaintiff for a promotion from a Business Services Officer III to a Business Services Officer IV. Plaintiff received the promotion and a raise in November 2007.[3]

- BB&T used performance development plans ("PDP") to evaluate the performance of employees. In PDPs, BB&T employees are evaluated across a number of different

---

[1] Plaintiff does not dispute the substance of this fact, but plaintiff objects to the declaration used to support the fact, the Declaration of Mark Menkis. In this respect, plaintiff states that the supporting declaration fails to meet the requirements of Rule 56(c)(4), Fed. R. Civ. P. Plaintiff does not explain how the declaration fails to meet those requirements, and a review of the declaration in question shows that the declaration meets the requirements of Rule 56(c)(4), Fed. R. Civ. P.

[2] Plaintiff contends that this is a legal conclusion. Although the fact that Defendant Truist Bank is the successor-in-interest to BB&T is a legal conclusion, it is also a fact that is not in dispute for the purpose of this litigation. Indeed, if plaintiff truly objects to the conclusion that Defendant Truist Bank is the successor-in-interest to BB&T, then plaintiff would appear to have brought this lawsuit against defendants unrelated to the allegedly discriminatory conduct.

[3] In defendants' statement of undisputed facts, defendants claimed that Williams promoted plaintiff on October 7, 2007. The record reflects that the plaintiff was recommended for a promotion in late October and promoted in November 2007. *See* Letter from Williams to Strehle, Dkt. 18, Ex. 3.

performance areas and given one of the following five ratings in each: needs immediate improvement, growth opportunity, performer, very good performer, and exceptional performer.

- A rating of "needs immediate improvement" indicates that the employee's "level of achievement is considered to be below the minimum requirements for the position." BB&T PDP for Pl., Dkt. 18, Ex. 4. Being rated as a "growth opportunity" means that the employee is not meeting his supervisor's expectations.

- In plaintiff's annual PDP for 2009, Williams rated plaintiff as a "growth opportunity" in three of twenty-two scored core competencies and in two of five objectives. Williams rated plaintiff as a "performer" in twelve core competencies and three objectives, and as a "very good performer" in seven core competencies.

- In plaintiff's 2009 PDP, Williams wrote that "[s]ince [receiving a promotion in 2007], [plaintiff's] performance has been below expectations for a [Business Services Officer] IV." BB&T PDP for Pl., Dkt. 18, Ex. 4.

- A month before plaintiff's evaluation, plaintiff wrote an e-mail to Williams regarding plaintiff's performance:

    > I allowed myself to get behind and bogged down and have for the past two months worked to get out from under the backlog I myself created. I'm not completely caught up but have made a lot of progress.

    E-mail from Plaintiff to Williams (Jan 14, 2010), Dkt. 18, Ex. 5.

- Generating or attracting new clients was a difficult area for plaintiff in 2009 and continued to be so over the next several years.

- In addition to annual reviews, supervisors at BB&T conducted mid-year employee evaluations as part of the performance review process. Supervisors do not provide a rating for each specific objective or core competency. Instead, the supervisor provides general comments describing the employee's year-to-date performance.

- Williams conducted plaintiff's 2010 mid-year review on or about July 29, 2010. Among other comments, Williams noted that plaintiff was failing to meet plaintiff's 80 percent balanced performance goals and stated that plaintiff's "pipeline has been weak this year, indicating the need for additional prospecting to generate new business." 2010 Mid-Year Review, Dkt. 18, Ex. 7.

- Williams conducted plaintiff's 2011 mid-year review on or about August 12, 2011. Williams concluded plaintiff's mid-year assessment by writing:

    > [Plaintiff] continues to have a very challenging year in productivity and results. [Plaintiff's] balanced performance [year to date] is 57%—well

> below requirements. [Plaintiff] is not meeting threshold in any production/matrix category other than loan pricing. [Plaintiff's] results and need for improvement continues [sic] to be discussed in our regularly scheduled coaching sessions.

2011 Mid-Year Review, Dkt. 18, Ex. 6.

- Plaintiff acknowledged that Williams believed that plaintiff needed to improve plaintiff's performance, and plaintiff had no reason to think that Williams held this belief because of plaintiff's age.

- Williams conducted plaintiff's 2011 annual review on or about February 28, 2012. In the review, Williams rated plaintiff's overall performance as "needs immediate improvement," the lowest rating that an employee can receive. Additionally, Williams noted that "[t]his is [plaintiff's] third year in a row of weak performance." 2011 Annual Review, Dkt. 18, Ex. 8.

- Plaintiff does not believe that plaintiff's age played any role in Williams' evaluation of plaintiff.

- On November 22, 2011, Ms. Williams placed Mr. Zeh on a performance improvement plan ("PIP"). According to BB&T's Performance Review Policies, PIPs are "[f]ormal coaching plans designed to assist an associate in improving his or her performance and meeting performance expectations." BB&T Disciplinary Policy, Dkt. 24, Ex. 4. According to plaintiff's later supervisor, Mark Menkis, a PIP is "a disciplinary tool that notifies employees of severe performance deficiencies and identifies specific areas where they are expected to improve." Declaration of Mark Menkis, ¶ 5, Dkt. 18, Ex. 1.[4]

- In the PIP, Williams identified eight areas where plaintiff was not meeting threshold targets and stated the goals that plaintiff was expected to meet. Plaintiff acknowledged that Williams was justified in putting him on the PIP and that Williams' decision was not connected to plaintiff's age.

- On January 31, 2012, Williams issued plaintiff a written warning, notifying plaintiff that he was not on track to meet the goals of the PIP and identifying specific areas in which plaintiff continued to underperform.

- Williams met with plaintiff again on or about February 16, 2012. Williams informed plaintiff that he was not "on track to even closely meet the goals" and that Williams was "extremely disappointed." February 16, 2012 Williams Memo, Dkt. 18, Ex. 11.

---

[4] Plaintiff objects to the use of the Declaration of Mark Menkis to establish this fact on the ground that the declaration fails to meet the requirements of Rule 56(c)(4), Fed. R. Civ. P. Plaintiff is incorrect. Plaintiff does not explain how the declaration fails to meet those requirements, and a review of the declaration in question shows that the declaration does meet the requirements of Rule 56(c)(4), Fed. R. Civ. P. Plaintiff further objects to Menkis' description of a PIP as subjective and argumentative and inconsistent with BB&T policy. Regardless of how Menkis' description is characterized, it is undisputed that Menkis described PIPs in the manner described.

- After the February 16, 2012 meeting, Williams saw improvement in plaintiff's performance. Although plaintiff did not meet the thresholds outlined in the PIP, plaintiff "made some progress" and, on April 16, 2012, Williams extended plaintiff's PIP period. April 16, 2012 PIP Memo, Dkt. 18, Ex. 12. Even though plaintiff again failed to meet the PIP performance thresholds, Williams extended the PIP period a second time in August 2012 after plaintiff "continue[d] to make progress." August 8, 2012 PIP Memo, Dkt. 18, Ex. 13.

- Plaintiff worried that his employment was going to be terminated while plaintiff was on the PIP. Plaintiff testified that he believed that plaintiff's age was unrelated with plaintiff's placement on the PIP and that Williams was justified in her assessment of his performance. Nonetheless, plaintiff retained an attorney to write a letter to BB&T on plaintiff's behalf.

- In the letter, plaintiff's then-attorney wrote that plaintiff "plans to likely [sic] cease full-time work as of the summer of 2014." March 26, 2012 Letter from David to Strehle, Dkt. 18, Ex. 14.[5]

- At some point thereafter, plaintiff transferred to the position of Servicing Business Services Officer II. In this new position, plaintiff was not responsible for generating new business and was assigned to work on smaller relationships. Plaintiff believes that plaintiff may have received a reduction in compensation in that position.

- Later, BB&T eliminated the Servicing Business Services officer role across the bank. BB&T then transferred plaintiff to work as a Small Business Specialist II. The Small Business Specialist II role was functionally equivalent to the role of Business Services Officer that plaintiff held while working for Williams. Mark Menkis was plaintiff's new supervisor.

- At the outset, plaintiff got along "just fine" with Menkis. Deposition of Albert Zeh at 158:4-10. Plaintiff saw Menkis basically every day during 2014 and had no problems working with him.

- In or about March 2015, Menkis issued plaintiff an annual review for calendar year 2014. Menkis rated plaintiff as "meets expectations" and issued him a bonus and salary increase based on that rating. At that time, plaintiff was 67 years old.

- Additionally, Menkis wrote in plaintiff's annual review that plaintiff "indicated that [plaintiff] is happy in his current role and is currently working because [plaintiff] enjoys what he is doing. [Plaintiff] is happy continuing to produce on this team as long as he is able." 2014 Annual Review, Dkt. 18, Ex. 17.

---

[5] Plaintiff does not dispute the contents of the letter but asserts that plaintiff "did not review the letter before it was sent and was unaware of any representation about a retirement date." Mem. in Supp. of Pl. Opp'n, 5, Dk. 24. In that regard, in his deposition plaintiff stated that plaintiff did not "recall why [plaintiff's then-attorney] would have written [that plaintiff had shared his retirement plans with BB&T]." Deposition of Albert Zeh, at 146:7-12, Dkt. 24, Ex. 1.

- In February 2015, plaintiff received a written warning from Menkis for a mistake that plaintiff made involving a real estate valuation. Plaintiff does not believe that his age was a factor in receiving the written warning.

- By mid-2015, plaintiff's revenue production had declined from fifteenth in the company in 2014 to thirty-fifth.

- Plaintiff alleges that, beginning sometime in May or June 2015, Menkis became publicly critical of plaintiff's performance during weekly team meetings. Plaintiff alleges that Menkis would do a "tactical take-down line-by-line; what are you doing, why aren't you doing better, what happened to this deal that you talked about last week. . . . It built from a mild to a hurricane [sic], if you will, over a period of time." Deposition of Albert Zeh, at 167:5-10, Dkt. 18, Ex. 2. Plaintiff claims that, in this manner, Menkis bullied and ridiculed plaintiff. Plaintiff did not allege that any age-related comments were made by Menkis during these meetings.

- Plaintiff acknowledges that plaintiff was not performing satisfactorily during this time, that plaintiff was "having a hard time [in terms of loan production]" and "having a lot of deals turned down." *Id*. at 168:6-10. Plaintiff does not believe that either Menkis or plaintiff's age was to blame for these issues.

- On September 3, 2015, Menkis issued plaintiff's mid-year review for 2015. In the evaluation, Menkis wrote that "[d]uring the first six months of this review period, [plaintiff's] performance [was] not meeting expectations compared to the goals and objectives established for [plaintiff's] position as a Small Business Specialist." 2015 Mid-Year Review, Dkt. 18, Ex. 19.

- In the 2015 Mid-Year Review, Menkis noted that plaintiff's "decathlon score," a composite of various metrics by which employees are evaluated, was 57.71 percent, which was well below the expectation of at least 70 percent. Similarly, plaintiff achieved less than 65 percent of plaintiff's monthly revenue goal, putting him near the bottom among employees in his position.[6]

- Plaintiff concedes that, as of September 2015 when plaintiff's mid-year review was issued, plaintiff was "not meeting expectations compared to the goals and objectives for [his] position as a small business specialist." Deposition of Albert Zeh, at 186:10-15, Dkt. 18, Ex. 2. On his mid-year review, plaintiff commented, "I can do better and I will." 2015 Mid-Year Review, Dkt. 18, Ex. 19.

---

[6] Plaintiff disputes the assertion that plaintiff was near the bottom among employees in his position. Defendants' statement is supported by the record evidence, as Menkis noted in the 2015 Mid-Year Review, plaintiff's score ranked plaintiff as "number five out of seven Small Business Specialists in Revenue in Greater Washington." 2015 Mid-Year Review, Dkt. 18, Ex. 19. There were only two employees in plaintiff's position who did worse than plaintiff, and one of those employees had "been in the position less than 12 months." *Id*. Therefore, the statement that plaintiff was near the bottom among employees in his position is factually correct based on the record evidence.

- On October 1, 2015, Menkis placed plaintiff on a PIP because of plaintiff's continued poor performance. Plaintiff concedes that, at the time the PIP was issued, plaintiff was not meeting the minimum expectations of his position.

- At the time plaintiff was placed on a PIP, several other BB&T team members were also failing to meet performance goals. *See* BB&T Balanced Performance Matrix, Dkt. 24, Ex. 2, Att. A. However, other than one employee who was new to the role of Small Business Specialist, plaintiff had the lowest decathlon score and lowest revenue generation in the region. Plaintiff was the only team member placed on a PIP.

- Like plaintiff's previous PIP, the October 2015 PIP established expectations for plaintiff to improve over a ninety-day period. Plaintiff's PIP also reflected the standard bank-wide decathlon performance score for plaintiff of 75 percent.[7]

- Over the course of the PIP, Menkis avers that he met with plaintiff to offer help and guidance on how plaintiff could improve plaintiff's performance. *See* Declaration of Mark Menkis, ¶ 8, Dkt 18, Ex. 1. Plaintiff, in his deposition, agreed that he met with Menkis more than once a month, but plaintiff avers in his declaration that Menkis would not help plaintiff with software with which plaintiff struggled. *See* Deposition of Albert Zeh, 194:15-19, Dkt. 18, Ex. 2; Declaration of Albert Zeh, Dkt. 24, Ex. 2.

- On November 4, 2015, Menkis issued plaintiff a written warning that outlined plaintiff's performance deficiencies. Notably, plaintiff's decathlon score was 54.8 percent the for year-to-date and 47 percent for the month of September. November 4, 2015 Warning Letter, Dkt. 18, Ex. 21.[8]

- Despite this warning, plaintiff's performance did not improve and in fact declined further in some areas. Although plaintiff was required to generate $16,000 in monthly revenue, plaintiff had produced only $1,565 for the month of November as of November 27, 2015. Plaintiff alleges that plaintiff's performance declined further due to lack of support and lack of assistance in learning how to use software tools.[9]

---

[7] Plaintiff claims that plaintiff's PIP raised the expected decathlon performance score from 70 percent to 75 percent. However, the second declaration of Mark Menkis reflects the fact that the PIP expected decathlon performance score of 75 percent reflected bank-wide performance goals, while the previously mentioned 70 percent reflected the region-specific performance goal. *See* Second Declaration of Mark Menkis, Dkt. 28, Ex. 1.

[8] Plaintiff purports to dispute this fact by arguing that any comparison between plaintiff's performance before being placed on the PIP and after being placed on the PIP is somehow illegitimate because plaintiff raised his performance goals on the PIP. This does not create a genuine dispute of material fact. Importantly, plaintiff's performance was below both the 70 percent and the 75 percent performance goals.

[9] Plaintiff does not allege that there was any change in level of support from earlier in the year to October and November 2015. It is therefore unclear how lack of support impacted plaintiff's further decline in performance. Nonetheless, plaintiff's claim does not create a dispute of material fact.

7

- Plaintiff's decathlon score further worsened after the November 4, 2015 warning. For November 2015, plaintiff's decathlon score was 16.2 percent, below both region-wide goal of 70 percent and the bank-wide goal of 75 percent. Likewise, although plaintiff was expected to make two to three "planned purposeful calls" per day, in November 2015 plaintiff averaged less than one call per day.

- On December 3, 2015, Menkis met with plaintiff to discuss plaintiff's performance. Plaintiff acknowledges that plaintiff was not meeting BB&T's expectations at that time.

- During the December 3, 2015 meeting, Menkis told plaintiff that a failure to improve his performance might lead to termination. Menkis did not tell plaintiff to retire, encourage plaintiff to retire, or say that plaintiff would be terminated if plaintiff did not retire.

- During the meeting, Menkis told plaintiff to speak with Michael Peacock, another BB&T employee in the Greater Washington Region. Peacock was not plaintiff's supervisor or manager. Menkis did not instruct Peacock or anyone else to tell plaintiff that he needed to retire or to encourage plaintiff to retire.

- Plaintiff met with Peacock later that day. Plaintiff believes that Peacock was prepared for the meeting. Peacock avers that he was not expecting plaintiff, and Peacock viewed the conversation as "simply a conversation between two people who work together." Declaration of Michael Peacock, Dkt. 28, Ex. 3.

- During plaintiff's conversation with Peacock, Peacock repeated several times that plaintiff needed to retire and asked plaintiff "why don't you retire." Declaration of Albert Zeh, Dkt. 18, Ex. 2. Plaintiff believed that Peacock's comments meant "that BB&T wanted [plaintiff] out." *Id*. ¶ 12. In response, plaintiff suggested a retirement date of June 30, 2016. Peacock replied that he "d[id]n't think they will accept that." *Id*. Plaintiff suggested a retirement date of March 31, 2016, to which Peacock replied, "they will accept that." *Id*.

- On December 7, 2015, plaintiff e-mailed Terrence Bayly, BB&T's Human Resources Representative, the following message:

  > Good day to you Terrence! I would like to officially notify the bank of my intention to retire as of March 31, 2016. Besides providing the notice in writing, to whom should I send notice of my intentions?

  E-mail from Zeh to Bayly (Dec. 7, 2015), Dkt. 18, Ex. 23.

- Later that day, plaintiff followed up with an e-mail to Bayly and Menkis, writing to "confirm that [plaintiff] ha[d] spoken to the benefits department today establishing that [plaintiff] wish[ed] to retire effective 3 31 2016." *Id*.

- After submitting the notice of plaintiff's intention to retire, plaintiff never expressed that he had changed his mind about submitting his retirement application, nor did plaintiff ever e-mail Bayly or anyone else to state that plaintiff wanted to continue working.

8

- Plaintiff states that he "did not want to retire." Declaration of Albert Zeh, ¶ 13, Dkt. 24, Ex. 2. However, plaintiff believed that "it was obvious that Mark [Menkis] was going to fire [plaintiff] at the end of the PIP," so plaintiff "did not think [he] had a choice [about retiring]." *Id*.

- Plaintiff was aware that BB&T's handbook included a procedure through which employees could raise concerns about discrimination. Yet plaintiff never filed a complaint of age discrimination with BB&T, nor did plaintiff make any informal complaints to anyone about alleged age discrimination.

- Plaintiff never asked Menkis or anyone else if plaintiff's PIP could be extended to allow plaintiff additional time to improve his performance, despite the fact that BB&T had twice extended the time period for plaintiff's first PIP.

- After plaintiff announced his retirement, plaintiff prepared for it by taking steps to leave his files in good working order, meeting with friends, and cleaning out his office. After plaintiff's department threw him a retirement party, plaintiff retired from BB&T on March 31, 2016.

- Plaintiff immediately began receiving monthly pension payments from BB&T and began drawing social security later in 2016.

- Plaintiff did not apply for unemployment benefits after leaving BB&T because plaintiff did not believe that he was eligible because he had "retired as opposed to being involuntarily separated." Deposition of Albert Zeh, 65:19-66:12, Dkt. 18, Ex. 2.

- After retiring from BB&T, plaintiff applied for positions at other financial institutions, but was not hired. In April 2016, plaintiff took a job with Reston Limousine Service. Plaintiff worked as a driver for Reston Limousine Service from April 2016 to June 2017. In June 2017, plaintiff ended his employment relationship with Reston Limousine Services after deciding to relocate permanently to San Diego, California.

- Plaintiff lived in California for two years, during which plaintiff did not work or attempt to work. When plaintiff returned to Virginia in 2019, plaintiff again sought employment.

On April 23, 2020, plaintiff brought this action alleging one count of age discrimination under the Age Discrimination in Employment Act of 1967. Specifically, plaintiff alleges that defendants discriminated against plaintiff on the basis of his age and constructively discharged plaintiff by forcing plaintiff's retirement. On November 20, 2020, defendants filed the instant

motion for summary judgment. Oral argument on the motion was held telephonically on January 27, 2021. The motion has been fully briefed and argued and is now ripe for disposition.

## II.

The standard for summary judgment is well-settled and does not require extensive elaboration here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colletion Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

Under the ADEA, it is unlawful for employers to discriminate against employees because of the employee's age. *See* 29 U.S.C. § 623. To avoid summary judgment on an ADEA claim, a plaintiff must either produce direct evidence of age discrimination or rely instead on the *McDonnell Douglas* burden shifting framework. Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*)). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case for age discrimination. If the plaintiff does so, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the action taken.

Then, unless the plaintiff can show that the proffered explanation is pretextual, the motion for summary judgment will be granted. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Here, plaintiff has not produced direct evidence of discrimination. Although plaintiff claims that he has proffered direct evidence, labeling evidence as "direct" does not make it so. Plaintiff claims that the following evidence is direct evidence of discrimination:

(i) The 2012 letter from plaintiff's lawyer to defendants that suggested plaintiff was going to retire in 2014.

(ii) Language in plaintiff's 2014 performance review stating "[plaintiff] has indicated that he is happy in his current role and is currently working because he enjoys what he is doing. He is happy continuing to produce on this team as long as he is able." 2014 Annual Review, Dkt. 18, Ex. 17.

(iii) Plaintiff's 2015 PIP, which allegedly stated a higher performance goal than applied to younger team members.

(iv) Public criticism of plaintiff's revenue production.

(v) The fact that defendants lowered revenue production goals for the entire team after plaintiff retired.

The evidence presented by plaintiff is clearly not direct evidence because it does not "reflect directly on the alleged discriminatory attitude and . . . bear directly on the contested employment decision." *Johnson*, 309 F. App'x. at 681. To begin with, the 2012 letter from plaintiff to defendants is not related to the contested employment decision and does not in any way reflect a discriminatory attitude on the part of defendants. Next, even assuming that the language in plaintiff's 2014 annual review—which was generally positive and granted plaintiff a raise and a bonus—reflects a discriminatory attitude, the language does not "bear directly" on the contested employment decision because the review was not a basis for any adverse action or even any criticism, and is therefore not direct evidence of discrimination. With respect to plaintiff's PIP performance goal, the record reveals that the allegedly higher goal reflected the standard bank-

11

wide goal. Moreover, even assuming that plaintiff was given a higher performance goal than his younger coworkers (the record evidence does not so reflect), such evidence would not constitute direct evidence of age discrimination because it does not "reflect directly on the alleged discriminatory attitude." *Id*.[10] Similarly, public criticism of plaintiff's performance, which plaintiff admits was failing to meet expectations, clearly does not reflect directly on the alleged discriminatory attitude because the criticism was not related to plaintiff's age. Finally, the bank-wide change in production goals after plaintiff's retirement neither connects with the contested employment action nor reflects the alleged discriminatory attitude because the change occurred after plaintiff retired and was in no way related to plaintiff. Thus, plaintiff has plainly not proffered any direct evidence of discrimination. Accordingly, it is only necessary to address whether plaintiff has established a prima facie case under *McDonnell Douglas'* burden-shifting framework.

## III.

In order to establish a prima facie case of age discrimination under the *McDonnell Douglas* burden-shifting framework, plaintiff must show:

    (i) that plaintiff was a member of the protected class;

    (ii) that plaintiff suffered an adverse employment actions;

    (iii) that plaintiff was qualified for the job and was performing in accordance with his employer's legitimate expectations; and

    (iv) that a substantially younger individual with comparable qualifications replaced plaintiff.

---

[10] Although a higher performance goal on a PIP could be indirect evidence of discrimination if the goal were the result of a discriminatory animus (there is no record evidence to support such a situation here), the Fourth Circuit has made clear that such evidence does not amount to direct evidence of age discrimination. *See*, *e.g.*, *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 521 (4th Cir. 2006) (finding that a supposedly discriminatory performance audit was not direct evidence of age discrimination).

*Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (citing *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006)). As the Fourth Circuit has made clear, although a plaintiff's burden is not onerous, a plaintiff must nevertheless prove his prima facie case by a preponderance of the evidence. *See Arthur v. Pet Dairy*, 593 F. App'x 211, 216 (4th Cir. 2015).

These principles, applied here, point convincingly to the conclusion that plaintiff has failed to make a prima facie case of age discrimination. The parties do not dispute that plaintiff is a member of the protected class and that plaintiff was replaced by someone substantially younger than plaintiff. However, the undisputed factual record reflects that plaintiff did not suffer an adverse employment action. To the contrary, in this respect the undisputed record contains no facts demonstrating that plaintiff's environment was so objectively intolerable that he was constructively discharged. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997). Moreover, even assuming *arguendo* that plaintiff's voluntary retirement constitutes constructive discharge, the record evidence is clear that plaintiff was not performing in accordance with defendants' legitimate expectations.

First, there is no persuasive evidence to support the conclusion that plaintiff suffered an adverse employment action. Indeed, the record evidence makes clear that plaintiff retired. In this respect, plaintiff sent an e-mail to BB&T's human resources on December 7, 2015 to "notify the bank of [his] intention to retire as of March 31, 2016." E-mail from Zeh to Bayly (Dec. 7, 2015), Dkt. 18, Ex. 23. On March 31, 2016, plaintiff retired after attending a retirement party with his coworkers. Nonetheless, plaintiff claims that he was constructively discharged. This argument is unpersuasive. The Fourth Circuit has made clear that, in order to prove constructive discharge, a plaintiff must show "that the employer intended to induce the plaintiff to quit" and "that 'a reasonable person in the employee's position would have felt compelled to resign' by the

13

employer's actions." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 733 (4th Cir. 1996) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), cert. denied, 475 U.S. 1082 (1986)). In determining whether an employee was coerced to resign, courts apply a totality of circumstances test gauged by an objective standard. *See Stone v. Univ. of Maryland Med. Sys. Corp.,* 855 F.2d 167, 174 (4th Cir. 1988).

Here, the only evidence plaintiff presents to support his contention that he was constructively discharged is: (i) that plaintiff's supervisor Mark Menkis told plaintiff that plaintiff was not meeting expectations and that a failure to improve performance might lead to termination; (ii) that during that meeting Menkis told plaintiff to speak with Michael Peacock, another BB&T employee in the Greater Washington Region; (iii) that when plaintiff met with Peacock later that day, Peacock repeated several times that plaintiff should retire; (iv) that when plaintiff suggested a retirement date of June 30, 2016, Peacock replied that Peacock "d[id]n't think they w[ould] accept that";[11] and (v) that when plaintiff suggested a retirement date of March 31, 2016, Peacock replied that "they will accept that." Declaration of Albert Zeh, ¶ 12, Dkt. 18, Ex. 2. This evidence is clearly insufficient to show either that BB&T intended to induce plaintiff to retire or that a reasonable person in plaintiff's position would have felt compelled to retire. *See Burns*, 96 F.3d at 733.

The evidence is insufficient to show that BB&T intended to induce plaintiff to retire. Plaintiff's team lead, Menkis, did not tell plaintiff to retire, did not encourage plaintiff to retire, and did not tell plaintiff that plaintiff would be terminated if plaintiff did not retire. The record evidence reveals that the only person who may have encouraged plaintiff to retire was Michael Peacock, who was not plaintiff's supervisor or manager. Notably, the record reflects that Menkis

---

[11] Declaration of Albert Zeh, ¶ 12, Dkt. 18, Ex. 2.

did not instruct Peacock or anyone else to tell plaintiff that he needed to retire or to encourage plaintiff to retire.[12] Indeed, Peacock viewed the conversation as "simply a conversation between two people who work together." Declaration of Michael Peacock, Dkt. 28, Ex. 3. Thus, plaintiff has failed to prove by a preponderance of the evidence that BB&T intended to induce plaintiff to retire.

Moreover, the evidence is insufficient to show that a reasonable person in plaintiff's position would have felt compelled to retire. Importantly, plaintiff has not presented any persuasive evidence that his working conditions were so intolerable as to force plaintiff to retire. *See Munday*, 126 F.3d at 244. Seeking to avoid this conclusion, plaintiff argues that Menkis micro-managed plaintiff, that Menkis would "demean and criticize" plaintiff in team meetings, and that Menkis would "publicly demand[] status information about each of [plaintiff's] contracts and loans." Declaration of Albert Zeh, ¶ 5, Dkt. 18, Ex. 2. Plaintiff's evidence is clearly insufficient to show constructive discharge. As the Fourth Circuit has sensibly held, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004) (citing Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994)). Plaintiff also argues that he retired only because he "did not think [he] had a choice" and because plaintiff thought that "BB&T wanted [him] out." Declaration of Albert Zeh, ¶ 13, Dkt. 18, Ex. 2. This evidence is also insufficient to show constructive discharge. As the Fourth Circuit has made clear, the fact "that the employee may perceive his only option to be resignation . . . is irrelevant." *Stone*, 855 F.2d at 174. Furthermore, even assuming that plaintiff is correct that he would have been terminated for failing to improve his performance on his PIP if he had not retired—an assertion

---

[12] Plaintiff contends that Peacock "was expecting [plaintiff]" and appears to speculate that Menkis instructed Peacock to push plaintiff to retire. However, plaintiff offers no evidence for that contention beyond his own speculation.

15

for which plaintiff provides no persuasive evidence—that, too, would be insufficient to amount to constructive discharge. As the Fourth Circuit has noted, "the mere fact that the choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary. . . . This is so even where the only alternative to resignation is facing possible termination for cause." *See Stone*, 855 F.2d at 174. In conclusion, a reasonable person in plaintiff's position clearly would not have felt compelled to retire. Therefore, plaintiff has failed to establish by a preponderance of the evidence that plaintiff suffered an adverse employment action by being constructively discharged.

Nor, importantly, does the undisputed record evidence establish by a preponderance of the evidence that plaintiff was meeting the legitimate expectations of BB&T when plaintiff retired. Clearly, the record reflects that plaintiff was not meeting defendants' legitimate expectations. Therefore, even assuming *arguendo* that plaintiff was constructively discharged, plaintiff nevertheless fails to make a prima facie case for age discrimination. As the Fourth Circuit has made clear, in determining whether plaintiff was meeting his employer's legitimate expectations, "[i]t is the perception of the decision maker which is relevant." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). And because it is plaintiff's burden to prove by a preponderance of the evidence that plaintiff met BB&T's "legitimate subjective employment expectations," at the prima facie stage the Court "must consider the employer's 'evidence that the employee was not meeting those expectations.'" *Arthur v. Pet Dairy*, 593 F. App'x 211, 217 (4th Cir. 2015) (quoting *Warch*, 435 F.3d at 515-16).

Here, the record evidence shows that plaintiff was failing to meet BB&T's legitimate expectations when plaintiff retired. Indeed, it is undisputed that plaintiff was failing to meet

16

BB&T's expectations when plaintiff was received his mid-year evaluation in September 2015, with plaintiff admitting that he was "not meeting expectations compared to the goals and objectives for [his] position as a small business specialist." Deposition of Albert Zeh, at 186:10-15, Dkt. 18, Ex. 2.[13] Additionally, at that time plaintiff was also objectively failing to meet the bank's expectations; plaintiff's decathlon score—a composite of various metrics by which employees are evaluated—was 57.71 percent, which was well below the region-wide expectation of 70 percent. As a result of plaintiff's poor performance, plaintiff was placed on a PIP in October 2015. In November 2015, Menkis issued plaintiff a written warning that outlined plaintiff's performance deficiencies. Notably, plaintiff's year-to-date decathlon score was 54.8 percent and was only 47 percent for the month of September. Over the next weeks, plaintiff's performance did not improve. Although plaintiff was required to generate $16,000 in monthly revenue, plaintiff had produced only $1,565 for the month of November as of November 27, 2015.[14] Likewise, in November 2015, plaintiff achieved a decathlon score of only 16.2 percent. This undisputed record evidence makes clear that plaintiff was failing to meet BB&T's legitimate expectations at the time plaintiff retired.

Seeking to avoid this conclusion, plaintiff argues that BB&T's expectations were not legitimate. This contention is meritless. Although plaintiff's PIP stated a higher decathlon score goal than the previously mentioned 70 percent, that higher goal reflected bank-wide performance

---

[13] Defendants additionally cite plaintiff's poor performance from 2009 to 2011 to support the argument that defendant generally struggled to meet the expectations set for small business specialists. Although the record evidence supports the fact that plaintiff struggled with loan production both in 2009 to 2011 and in 2015, the record also reflects that plaintiff improved after his initial struggles. Plaintiff's initial PIP therefore has little bearing on the analysis here.

[14] Plaintiff argues that the revenue generation goal of $16,000 was illegitimate because plaintiff's coworkers also struggled to meet the goal and because the goal was reduced by BB&T by $2,000 in 2016. This argument is unpersuasive. As the Fourth Circuit has made clear, courts do not sit "as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Indeed, the fact that an employer has high expectations does not in itself make an expectation illegitimate. *See Smith v. Premier Prop. Mgmt.*, 793 F. App'x 176, 179 (4th Cir. 2019). Moreover, even if BB&T's lowered revenue production goal of $14,000 per month were taken as the more appropriate expectation, plaintiff also failed by a substantial amount to meet that lowered goal.

goals, while the 70 percent reflected the region-specific performance goal. Moreover, importantly, plaintiff was failing to meet either the bank-wide or the region-specific performance goals when he notified BB&T of his intention to retire in December 2015. Plaintiff further argues that plaintiff's expectations were illegitimate because other coworkers also failed to meet the bank performance goals, but those other coworkers were not placed on PIPs or terminated. Plaintiff's argument is unconvincing. For, as an initial matter, the objective metrics used by BB&T reveal that plaintiff was at or near the bottom of almost every metric used to evaluate plaintiff and his coworkers. Moreover, at the end of the year plaintiff placed behind all other small business specialists in the region. Therefore, even though several coworkers also failed to meet the region-wide decathlon goal of 70 percent, BB&T's expectation that plaintiff do better is not illegitimate; plaintiff was one of BB&T's lowest-performing small business specialists in the region, with a 2015 decathlon score of 52.3 percent. BB&T's expectation that plaintiff improve was therefore legitimate.

* * *

In conclusion, plaintiff has failed to make a prima facie case for age discrimination because plaintiff has not proven by a preponderance of the evidence that plaintiff was constructively discharged or that plaintiff was meeting BB&T's legitimate expectations. Accordingly, defendants' motion for summary judgment must be granted.

An appropriate order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
March 31, 2021

/s/
T. S. Ellis, III
United States District Judge